**CONOCOPHILLIPS COMPANY, Appellant,**

v.

**INCLINE ENERGY, INC., Appellee.**

No. 11–03–00361–CV.

Court of Appeals of Texas, Eastland.

March 23, 2006.

---

31. *See* Tex.R.App. P. 47.1.

Susan R. Richardson, David W. Lauritzen, Cotton, Bledsoe, Tighe & Dawson, P.C., Midland, for appellant.

Michael A. Short, Adam J. Walker, Jeffrey M. Johnston, Short & Johnston, Midland, Gary M. Bellair, Craig, Terrill, Hale & Grantham, L.L.P., Lubbock, for appellee.

Panel consists of: WRIGHT, C.J., and McCALL, J.

## OPINION

JIM R. WRIGHT, Chief Justice.

After a bench trial, the trial court held that the pricing provision in a gas purchase agreement was ambiguous. It entered a judgment for Incline Energy, Inc. (the gas seller)[1] against ConocoPhillips Company (the gas purchaser). We find that the agreement was not ambiguous, and we reverse and render judgment that Incline take nothing by its lawsuit.

There is a rather lengthy history of the events giving rise to this lawsuit. We believe that a recitation of only a brief portion of that history is necessary to a resolution of this appeal.

Incline's claim against ConocoPhillips arises out of a pricing provision in a 1988 amendment to a 1986 gas purchase agreement. The agreement covered gas produced from a gas well known as the Olivia Spencer No. 1. The 1988 amendment provided, in relevant part, as follows:

> Subject to all terms, conditions and provisions of the Agreement, for the period beginning on the effective date hereunder and extending for the Term hereof, the price per MMBTU to be paid by Buyer to Seller each month shall be eighty percent (80%) of the price(s) which Buyer receives under its Resale Agreement(s) for all gas purchased and sold hereunder at the Point(s) of delivery, such gas produced from the subject lands and leases.

For purposes of this opinion, we offer an oversimplified description of the nature of gas that is produced from a gas well. As it comes from the well, gas is basically in a vaporous form and contains various impurities as well as various compounds. The compounds can be removed from the vapor and turned into marketable liquids known as natural gas liquids (NGLs). In order to remove NGLs from the natural gas, it is necessary to transport the gas through a pipeline to a processing facility where the gas undergoes various procedures that result in the extraction of the NGLs and leave residue gas.[2] The NGLs which have been extracted are used in the manufacture of many different products from gasoline to plastics and foam. The residue gas is sold.

The term "MMBTU" as used in the gas purchase agreement refers to the measurement of vaporous gas by using volume and heating value. The volume and the heating value in this case were determined when the gas entered ConocoPhillips's

---

1. Incline is not the only gas seller but claims to have the authority to represent the other sellers in this lawsuit.

2. We have intentionally omitted any discussion of the use of separators, compressors, fuel, line loss, and changes brought about during transportation as a result of varying pressures and temperatures, among other things. We do not believe that a discussion of items of that nature would affect the outcome of this appeal.

pipeline. ConocoPhillips based its payment to Incline on the weighted average residue gas price applied to the full volume and heating value (MMBTU) at the point of delivery from the Olivia Spencer No. 1.[3] Thus, it paid Incline 80% of the weighted average residue gas price as applied to MMBTUs of the entire gas stream measured at the point of delivery. ConocoPhillips contends that this is the proper measurement of the gas purchase price under the contract.

Incline contends that it should be paid on processed NGLs in addition to residue gas. Incline sued ConocoPhillips for breach of contract, specific performance, declaratory relief, and attorney's fees. The trial court agreed with Incline on its breach of contract claim and awarded Incline $795,312.80 as damages based upon prices for vaporous gas as well as prices for NGLs from the date that ConocoPhillips became the purchaser of gas under the agreement. The trial court also awarded Incline $85,013.80 in prejudgment interest and $184,607.48 as attorney's fees. In its judgment, the trial court denied all other relief not expressly granted.

 The primary concern when construing a written contract is to determine the true intentions of the parties as expressed in the agreement. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983). If the written agreement is worded such that it can be given a definite legal meaning, it is not ambiguous. Courts will construe unambiguous contracts as a matter of law. *Id.*

 Whether a contract is ambiguous is a question of law to be decided by the court. *Friendswood Dev. Co. v. McDade + Co.,* 926 S.W.2d 280, 282 (Tex.1996). A

court makes this determination by looking at the contract as a whole while considering the circumstances present when the parties entered it. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc.,* 907 S.W.2d 517, 520 (Tex.1995). We review de novo the issue of whether a contract is ambiguous. *Reilly v. Rangers Mgmt., Inc.,* 727 S.W.2d 527, 529 (Tex. 1987). Here, the trial court based its decision upon the conclusion that the agreement was ambiguous. We disagree and will address the issue de novo.

 A court may find an ambiguity only if the language in the contract is susceptible to two or more reasonable interpretations. *Enter. Leasing Co. of Houston v. Barrios,* 156 S.W.3d 547 (Tex. 2004). Parol evidence is not to be used for the purpose of creating an ambiguity. *Nat'l Union Fire Ins.,* 907 S.W.2d at 520. Such evidence may only be considered after the court has determined that the contract is ambiguous. *Id.*

 There are two classifications of ambiguities in contract law. A contract may be either patently ambiguous or it may be latently ambiguous. *Friendswood,* 926 S.W.2d at 282. A contract is patently ambiguous when the ambiguity is apparent on the face of the contract. *Nat'l Union Fire Ins.,* 907 S.W.2d at 520. A latent ambiguity is one that exists when a contract is unambiguous on its face "but fails by reason of some collateral matter when it is applied to the subject matter with which it deals." *Friendswood,* 926 S.W.2d at 282–83.

 In the trial court's conclusions of law, it concluded that "[a]n ambiguity exists as to whether or not the parties to the Gas Processing Agreement contemplated

---

**3.** At the point of delivery, the gas also included the NGLs, and they were included in the

measurement of MMBTUs at that point.

payment when the gas purchased was processed on the basis of both residue gas and natural gas liquids or on residue gas alone."

The trial court also concluded that, "[w]hen processing began, the latent ambiguity sprang into effect," resulting in two different, reasonable interpretations. Although we believe that the trial court's conclusions, when taken together, actually amount to a determination that the agreement was latently ambiguous, we will address patent as well as latent ambiguity.

We do not believe that the contract is patently ambiguous because it can be given a definite and certain legal meaning and also because it is not subject to two or more reasonable interpretations. *Id.* We make this determination by examining the contract as a whole in light of the circumstances present at the time that the contract was entered. *Id.*

Under the agreement, the price which ConocoPhillips was to pay per MMBTU, measured at the point of delivery, was 80% of the price ConocoPhillips received under its resale agreement for all gas purchased and sold under the agreement. There is no question about the meaning of the term "MMBTU." MMBTU is defined in the agreement as one million BTUs. The contract defines "point of delivery" to be the place gas purchased and sold under the agreement is delivered in accordance with Article VI of the agreement. Article VI of the agreement, among other things, further defines "point of delivery" to be the point at which the gas enters ConocoPhillips's pipeline from the outlet of any of Incline's treating facilities. It is worthy to note that the contract also provides that the title to the gas changes from Incline to ConocoPhillips at this point.

The contract defines "gas" as follows:

"Gas" shall mean the effluent vapor stream, including elements and compounds contained therein, at the Point of Delivery herein provided of each Gas Well, Gas Condensate Well and Oil well located on the Subject Lands and Leases, excluding liquid hydrocarbons which are removed by conventional gas/oil field separators of the type in use on the date hereof.

The contract then requires ConocoPhillips to measure MMBTUs at the point of delivery, which is near the wellhead, and to pay, per MMBTU so measured, 80% of the amount it received when it resold the gas. This court has previously held in a royalty payment case that, when there is a wellhead measurement, payment is due for gas in its natural state, not on the liquid hydrocarbons which are later extracted. *Carter v. Exxon Corp.*, 842 S.W.2d 393 (Tex.App.-Eastland 1992, writ denied); *see also Sowell v. Natural Gas Pipeline Co. of Am.*, 789 F.2d 1151, 1157–58 (5th Cir. 1986). We see no difference when the agreement calls for calculations to be made at the point of delivery at or near the wellhead and before it enters ConocoPhillips's pipeline.

The Olivia Spencer No. 1 agreement refers to the prices that buyer received under its "Resale Agreements(s)." At the time of the execution of the agreement and the amendment, the Natural Gas Policy Act (NGPA) of 1978 was in effect. *See* 15 U.S.C. § 3301 et seq. The NGPA referred to "resale" as the sale of natural gas all or a portion of which was both purchased and resold in transactions that are first sales as defined in the NGPA. Here, any sale would occur first between ConocoPhillips and Incline when the gas was delivered into the pipeline. ConocoPhillips was a vertically integrated company. The "resale" would take place at the time that ConocoPhillips resold the residue gas. Resales based upon residue gas are, as far as this case is concerned, always stated in

the Code of Federal Regulations in terms of MMBTUs. Any reference to natural gas liquids is stated in terms of gallons. The Olivia Spencer No. 1 contract calls for a price based upon MMBTUs, not gallons, and contains no provisions for sharing in the expenses and revenues related to processing.

Furthermore, Article III, 3.1(d) of the agreement in this case speaks directly to NGLs. By the terms of the agreement, Incline may remove all oil and liquid hydrocarbons by "conventional mechanical gas/oil field separators" prior to the point of delivery. The agreement provided that "[s]eller shall not be permitted to remove or recover hydrocarbons from the gas other than such as can be removed through the use of conventional mechanical gas/oil field separators."

We hold that the agreement, as amended, can be given a definite and certain meaning in this case and that, as a matter of law, it was not patently ambiguous.

We next examine the trial court's conclusion that the agreement was subject to a latent ambiguity and that the latent ambiguity "sprang into" effect when the gas from the Olivia Spencer No. 1 began to be processed. A latent ambiguity exists when a contract is unambiguous on its face "but fails by reason of some collateral matter when it is applied to the subject matter with which it deals." *Friendswood*, 926 S.W.2d at 282–83. In *National Union*, the court gave this example of a latent ambiguity: "[I]f a contract called for goods to be delivered to 'the green house on Pecan Street,' and there were in fact two green houses on the street, it would be latently ambiguous." *Nat'l Union Fire Ins.*, 907 S.W.2d at 520 n. 4. Here, we are not dealing with collateral matters, as with the example in *National Union*. We are dealing with the very heart and essence of the agreement: the pricing mechanism. The

agreement was not latently ambiguous as a matter of law.

Because the contract was unambiguous, it should be enforced as written. As written, the agreement requires ConocoPhillips to measure MMBTUs at the point of delivery which is near the wellhead and to pay per MMBTU so measured 80% of the amount for which it first resells gas. The resale of gas would exclude NGLs which have been removed prior to the time of the first gas resale.

The judgment of the trial court is reversed, and judgment is rendered that Incline, and those it represents, take nothing. Our holding on this issue is dispositive of this appeal, and we need not discuss other issues or cross-issues on appeal.

W.G. ARNOT III retired effective July 31, 2005, and is, therefore, not participating.