# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00175-CV

**C. A. Walker, Inc., Appellant**

**v.**

**Total Roofing Services, Inc., Appellee**

**FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 277TH JUDICIAL DISTRICT NO. 05-010-C277, HONORABLE KEN ANDERSON, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

Appellee Total Roofing Services, Inc. ("TRS") filed suit against appellant C. A. Walker, Inc. ("Walker") for breach of a construction contract. After a bench trial, the trial court awarded TRS $5,957.75 in damages, plus attorney's fees. Walker appeals, arguing that the trial court erred in failing to find that TRS committed a prior material breach of the contract and in calculating the award of damages in favor of TRS. We will modify the judgment of the trial court and affirm as modified.

## FACTUAL AND PROCEDURAL BACKGROUND

The following facts are undisputed. TRS, a roofing subcontractor, submitted a bid to perform work related to the construction of a Randall's grocery store in Round Rock, Texas. Walker, the general contractor, accepted TRS's bid and negotiated a subcontract under which Walker

agreed to pay TRS $289,975.50, subject to any additions and modifications. The contract defined the scope of the work as follows:

> 007410 COMPOSITE METAL PANELS[1], 07415 METAL ROOF PANELS, 07510 BUILT-UP ASPHALT ROOFING, 07511 ROOFING TESTING & INSPECTION SERVICE FOR BUILT-UP ASPHALT ROOFING, 07620 SHEET METAL FLASHING AND TRIM AND 7720 ROOF ACCESSORIES including the following items: furnish and install composite metal panels, metal roof panels, built-up asphalt roofing, roofing testing & inspection service for built-up asphalt roofing, sheet metal flashing and trim and roof accessories as shown per the above referenced plans and specifications[,] engineering and layout for the roofing & metals scope of work.

The contract further provided that any changes must be made by properly executed written change order and that "[a]ny and all changes performed prior to, or without receipt of, a properly authorized written change order will not be paid for by C. A. Walker Construction or by the Owner."

TRS began work on the project in January 2004. The following month, a dispute arose concerning whether TRS was responsible for buying and installing the composite metal panels to be used on the store's facade, which were not part of the roofing system. Walker asserted that the contract unambiguously required TRS to purchase and install all composite metal panels identified in the architect's drawings and specifications, including the panels on the building facade, while TRS took the position that it was responsible only for the panels to be installed as part of the store's roofing system.

In an attempt "to resolve [their] differences regarding the composite panel portion of [the parties'] contract," TRS submitted a letter proposal to Walker outlining a compromise: TRS

---

[1] Specification number 7410 states that the applications of composite metal panels includes both exterior and interior composite metal panels.

2

would purchase only the panels that it believed were covered by its bid (i.e., the roof panels), Walker would purchase the remaining panels (i.e., the panels for the building facade), and TRS would install all of the panels. Walker did not respond in writing to TRS's letter; subsequently, however, the parties orally agreed that Walker would provide the remaining composite metal panels for the facade and TRS would install those panels and complete the remaining punch list items for no further consideration.[2] Walker spent $43,765 to purchase the composite metal panels for the building facade, which TRS then installed.[3]

After the installation of all of the composite metal panels was complete, TRS filed suit against Walker to collect on "unpaid applications for payment and retainage due and owing . . . for labor, materials, and equipment." TRS asserted that it was owed $50,966.13 based on Walker's breach of the original roofing subcontract or, in the alternative, under quantum meruit. In addition, TRS sought "recovery in quantum meruit, sworn account and for breach of contract in the sum of $57,021.59 for the labor provided to Defendants for the non-roof related composite metal panels installed by Plaintiff . . . , which labor was outside the scope of the contract." TRS also sought pre-and post-judgment interest and attorney's fees.

---

[2] The terms of the parties' oral agreement are recited in Walker's Third Amended Answer and Counterclaims, its live pleading in this case, which comports with the description of the oral agreement in TRS's statement of facts in its appellee's brief.

[3] For reasons that are disputed, the facade was not completed entirely with composite metal panels, as contemplated by the original plans, and was instead completed with other materials, including stone and stucco. Michael Kravetz of Heights Venture Architects testified that this was a design-driven decision made by the owner in order to meet the deadline for the store's grand opening.

Walker counterclaimed for breach of contract and filed a verified denial as to TRS's suit on a sworn account. According to Walker's pleadings, TRS breached the original contract by failing to provide all of the composite metal panels required on the project and breached the subsequent oral contract by failing to complete the punch list items and repairs and by demanding payment for services that it had previously agreed to provide at no further cost to Walker.

The case was tried to the court, with the parties stipulating to certain facts at trial, including:

Walker made total payments to TRS of $256,383.84.

Walker asserts TRS's gross subcontract price, with approved change orders, is $295,130.46.

TRS asserts its gross contract price, with change orders, is $307,349.97.

The central issue in this case is whether the Parties' contract required TRS to purchase and install these disputed CMPs [composite metal panels].

At trial, TRS put on evidence that it understood its initial bid to cover only the work related to the roof installation, not to include the composite metal panels on the building's facade, and that this understanding was reflected in the parties' contract.[4] Walker objected to this testimony

---

[4] This evidence was introduced primarily through the testimony of Pete Pichini, a part-owner and officer of TRS, who testified that, as a roofer, he limited his bid to the roofing work and that, reading the project specifications in conjunction with the architect's drawings, it was clear that the installation of any composite metal panels beyond those required for the roof would be outside of the scope of his bid and subcontract. Documentary and testimonial evidence established that composite metal panels were called for under the "walls and parapets" section of the architectural plans for the building, in addition to the roofing system. Pichini further testified that the portion of TRS's bid relating to the composite metal panels was only $22,000—far less than the bids Walker received from other subcontractors to buy and install all exterior composite metal panels to be used

4

on the basis that the contract was unambiguous in requiring TRS to purchase and install all of the composite metal panels for the project; however, Walker also put on extrinsic evidence regarding the meaning of the contract specifications and whether the composite metal panels for the exterior walls of the building were included in TRS's scope of work.[5]

The trial court also heard evidence regarding the amounts outstanding to TRS based on its unpaid payment applications. According to Pete Pichini of TRS, it was owed a total of $49,722.75, which included its unpaid payment applications and change orders (totaling $42,576.34), and two additional unpaid invoices (in the amounts of $2,628.24 and $4,518.17). On cross-examination, Walker elicited testimony from Pichini that the latter two invoices did not have written, approved change orders associated with them, nor did one of TRS's payment applications.

Walker also put on evidence that it incurred additional expenses—including $8,000 worth of stucco work by Connelly Masonry and $6,850 for additional remedial work by New Dawn Enterprises—as a result of TRS's failure to purchase and install all of the composite metal panels for the building facade and to complete the punch list items for which it was responsible.

At the conclusion of the trial, the court found in favor of TRS, awarding it actual damages in the amount of $5,957.75, plus pre- and post-judgment interest and attorney's fees, and

---

on the store, i.e., for both the roof and facade.

[5] Thomas Walker, Walker's vice president and director of operations, testified that, based on his reading of the contract, the panels at issue were included within TRS's scope of work and that at no time during his negotiations with Pichini did he indicate that there would be any limitation on the scope of his composite metal panel work. In addition, Michael Kravetz, a representative from the architecture firm that designed and drew up the construction documents for the Randall's project, testified that, in his view, specification 07410 "covers all composite metal panels on the project . . . regardless of location."

ordering that Walker take nothing on its counterclaims.  The trial court issued the following findings of fact and conclusions of law relevant to this appeal:

> With change orders and modifications, the Contract total ultimately amounted to $306,106.59, payable by CA Walker to Total Roofing.

> CA Walker purchased composite metal panels at a cost of $43,765.00.

> Taking into consideration the cost of the composite metal panels, CA Walker owes Total Roofing $5,957.75 pursuant to the terms of the Contract.

> CA Walker failed to prove that Total Roofing owes CA Walker any amount of money pursuant to the terms of the Contract.

> CA Walker failed to prove that CA Walker had any right, contractually or otherwise, to withhold the $49,722.75 payment to Total Roofing.

> CA Walker breached the Contract by failing to pay Total Roofing $49,722.75, and Total Roofing prevails on its breach of contract claim.

> Because CA Walker purchased composite metal panels at a cost of $43,765.00, it is entitled to an offset for that amount.

> Taking into account CA Walker's offset of $43,765.00, Total Roofing is entitled to judgment against CA Walker for $5,957.75 in principal.

> Total Roofing did not breach the Contract, and CA Walker does not prevail on its breach of contract counterclaim or any other claim CA Walker asserted against Total Roofing in this action.

> Walker did not produce sufficient credible evidence to sustain its burden of proof that would entitle it to a credit for its payment to Connolly [sic] Masonry.

> Walker did not produce sufficient credible evidence to sustain its burden of proof that would entitle it to a credit for its payment to New Dawn Enterprises.

Walker now appeals, arguing that (1) TRS committed a prior material breach of the contract when it declared the purchase and installation of composite metal panels for the building

6

facade to be outside of its contractual scope of work, thereby relieving Walker of liability as a matter of law, (2) the trial court erred in its calculation and award of damages to TRS, and (3) the trial court should have awarded Walker, not TRS, attorney's fees as the prevailing party.

## STANDARDS OF REVIEW

Walker's first issue challenges the trial court's conclusion of law that Walker, not TRS, breached the parties' contract and the legal and factual sufficiency of its fact findings in support of the judgment. We review the trial court's legal conclusions de novo. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). Appellate courts review the factual and legal sufficiency of the trial court's findings of fact according to the same standards as jury findings. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994). In our review of the legal sufficiency of the evidence supporting the judgment, we must determine whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We review the evidence in the light most favorable to the verdict, crediting favorable evidence if a reasonable fact finder could and disregarding contrary evidence unless a reasonable fact finder could not. *Id.* A legal-sufficiency issue will be sustained if the record reveals one of the following: (1) the complete absence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence established conclusively the opposite of the vital fact. *Id.* Under our factual-sufficiency standard of review, we weigh all the evidence in the record and may overturn a finding only if it is so against

7

the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

**DISCUSSION**

By its first issue, Walker urges that the trial court erred in its interpretation of the parties' unambiguous contract by failing to find that TRS committed a prior material breach when it refused to purchase and install the composite metal panels to be used on the building facade. According to Walker, the "great weight and preponderance of the evidence demonstrates that TRS's prior material breach of the parties' Subcontract excused Walker's performance." TRS responds that the contract is unambiguous in its favor, requiring TRS to buy and install only those composite metal panels related to the roofing system. TRS further argues that, even if the contract were ambiguous on this point, Walker waived any claim that TRS breached the original subcontract when it subsequently agreed to resolve the dispute pursuant to the oral agreement it reached with TRS, which amounted to "a novation of the original contract."

As it indicated at the close of the evidence, the trial court's determination that TRS should prevail on its breach-of-contract claim was predicated on the court's ruling that the original contract was ambiguous, thereby creating a fact issue as to the parties' intent, and on its resolution of that fact issue in TRS's favor, despite the absence of any express findings or conclusions that the contract was ambiguous. Whether a contract is ambiguous is a question of law, subject to de novo review. *Bowden v. Phillips Petroleum Co.*, 247 S.W.3d 690, 705 (Tex. 2008). When construing a written contract, the court's primary duty is to determine the intent of the parties as expressed in the instrument, *see J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003), examining all

8

parts of the contract in light of the circumstances surrounding its formation, *Columbia Gas Transmission Corp. v. New Ulm Gas*, 940 S.W.2d 587, 589 (Tex. 1996). A contract is not ambiguous if it can be given a definite or certain meaning as a matter of law. *Columbia Gas Transmission Corp.*, 940 S.W.2d at 589. "On the other hand, if the contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous, which creates a fact issue on the parties' intent." *Id.*

It is well settled that a court may conclude that a contract is ambiguous even in the absence of such a pleading by either party. *Progressive County Mut. Ins. Co. v. Kelley*, 284 S.W.3d 805, 808 (Tex. 2009); *J.M. Davidson, Inc.*, 128 S.W.3d at 231; *Sage St. Assocs. v. Northdale Constr. Co.*, 863 S.W.2d 438, 445 (Tex. 1993); *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). To determine if a contract is ambiguous, we may examine extrinsic evidence concerning the circumstances surrounding the execution of the contract as they bear on the meaning of the terms the parties used. *See National Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 521 (Tex. 1995); *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981); *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518-19 (Tex. 1968). The court may not consider extrinsic evidence, however, in order to contradict or vary the meaning of the explicit language of the written contract. *National Union Fire Ins.*, 907 S.W.2d at 521. We examine that evidence only to assist us in understanding the object and purpose of the contractual language. *Id.*

Applying these rules to the present case, we hold that the trial court did not err in ruling that the contract at issue is ambiguous as to the scope of the subcontract work to be performed by TRS. Examining that contract as a whole and the circumstances present when Walker and TRS

9

entered into the agreement, we find two reasonable readings of the scope of work. On one hand, the contract states that it is for "Roofing and Metal," and that the work to be performed "will include, but is not limited to" providing material and labor for "composite metal panels" as well as "metal roof panels." This language could reasonably mean that the scope of the project would involve the purchase and installation of metal panels beyond what was required for the construction of the roof—i.e., composite metal panels for other parts of the building, such as the walls and parapets. On the other hand, as TRS argued, the reference in the contract to the specification "007410 COMPOSITE METAL PANELS" could be read much more broadly, referring not only to metal panels for the roof and exterior walls and parapets, but also to any panels that might be used for the *interior* of the building, in accordance with the description contained in specification 07410. Thus, it would be reasonable to infer that the many references to "roofing" circumscribed the scope of the metal work, confining it only to the composite metal panels related to or necessary to construct the roof, as opposed to all metal panels for the entire building.

Because the contract's scope-of-work provision cannot be given a certain or definite legal meaning, we agree with the trial court that it is ambiguous; therefore, the trial court properly considered extrinsic evidence of the parties' intent. The extrinsic evidence admitted at trial showed that TRS, a roofing company, intended its bid to cover only those composite metal panels related to the roofing system—those panels "that tied into [the] roofing system as defined on the drawings," as Pichini testified—and that the break-out of its bid dedicated only a small portion to materials costs, indicating that it did not intend to supply the composite metal panels to be used on the building's exterior walls and parapets. Accordingly, we conclude that the trial court did not err in

10

impliedly finding as a matter of fact that the parties intended that their contract would not include composite metal panels unrelated to the roof's construction within its scope, and therefore did not err in concluding that TRS did not breach the contract. We overrule Walker's first issue.[6]

In its second issue, Walker complains that the trial court erred in awarding TRS damages "where the unambiguous language of the subcontract required TRS to purchase and install all composite metal panels identified within the architect's specifications." We have already addressed this argument in our resolution of Walker's first issue, having determined that the contract is ambiguous and cannot be construed as a matter of law to require that TRS purchase and install the composite metal panels for the building facade.

Within its second issue, Walker further argues that the trial court erred in calculating the total contract price to be $306,106.59, asserting that this amount erroneously includes change orders that were not approved by Walker in writing pursuant to the terms of their contract governing modifications. According to Walker, the total amount of the subcontract, as modified by the approved change orders, was only $295,130.46, meaning that the trial court "inflated" the final contract price by $10,976.13.

TRS responds that, of the $10,976.13 in dispute, $7,146.41 represents work that TRS performed under the contract to remedy damage done to the roofing system by other subcontractors and additional labor costs owing to the improper location of work performed by another subcontractor. In support of its recovery, TRS points to two invoices, which Pichini testified were

---

[6] Accordingly, we need not reach Walker's third issue regarding attorney's fees, which is predicated on this Court's reversing the trial court's judgment that Walker breached the contract and rendering judgment that Walker, not TRS, is the prevailing party.

11

not change orders and therefore did not require Walker's prior, written approval.[7] In the alternative, TRS suggests that, "[e]ven if the invoices represented work done outside the scope of the subcontract, the trial court's inclusion of them in the damages award is supportable under the theory of quantum meruit, which TRS pleaded." Finally, TRS argues that the remainder of the disputed amount is supported by evidence in the form of a pay application that it submitted to Walker stating that the value of the work that TRS had completed under the parties' contract as of November 18, 2004, "including approved change orders, totaled $298,960.18."

In its reply brief, Walker urges that the pay application on which TRS relies includes a proposed change order for $2,519.98 that Walker states was never approved and was in fact rejected on the basis that the work it related to fell within TRS's scope of work under the contract. We agree with Walker that TRS presented no evidence that this $2,519.98 change order was approved in writing pursuant to the terms of the parties' contract. Therefore, the trial court erred in including that amount in the total contract price. As to the remaining disputed amounts, however, TRS presented more than a scintilla of evidence that they should be recovered in payment for work that it performed under the contract and that Walker was responsible for any remedial work and labor costs that were necessary for TRS to complete the work within the scope of its contract. *See City of Keller*, 168 S.W.3d at 827.

Finally, Walker challenges the sufficiency of the evidence supporting the trial court's findings that Walker failed to produce sufficient credible evidence entitling it to credits for its

---

[7] Invoice number 244885-D for $4,518.17 states that it is for the installation of "new T-tops and lead jacks that were damaged by others"; invoice number 244883-B for $2,628.24 is for "additional labor due to curbs being set in wrong location and having to be reset in proper location."

12

payments to Connelly Masonry and New Dawn Enterprises or supporting its claim for damages resulting from TRS's failure to supply a warranty. With respect to its request for an offset of $8,000 to Connelly Masonry, Walker asserts that it presented undisputed documentary evidence of damages arising from TRS's failure to complete the scope of its work, which forced Walker to substitute stone and stucco for the composite metal panels that Walker should have initially purchased and installed near the entrance of the store. Having already rejected Walker's argument that the contract was unambiguous in requiring TRS to purchase and install these disputed composite metal panels, we likewise reject its claim for damages based on TRS's purported breach.

Regarding the payments Walker made to New Dawn to "repair roof leaks and install missing flashing and other punch list items that were indisputably within TRS's roofing scope of work," the trial court heard conflicting testimony that it apparently resolved in TRS's favor. The trial court, as fact-finder, resolves conflicts in the evidence and determines the weight and credibility to give to witness testimony. *Young Chevrolet, Inc. v. Texas Motor Vehicle Bd.*, 974 S.W.2d 906, 914 (Tex. App.—Austin 1998, pet. denied); *see City of Keller*, 168 S.W.3d at 819. Accordingly, the trial court was entitled to credit Pichini's testimony that TRS completed all punch list items for which it was responsible, and that any repairs or punch list items that it did not perform resulted from Walker's preventing TRS from gaining access to the store. We will not disturb the court's resolution of evidentiary conflicts that turn on credibility determinations or the weight of the evidence. *See City of Keller*, 168 S.W.3d at 819-20. Moreover, Walker produced no evidence that Walker tried to make any claim on the warranty, that TRS refused to perform warranty work, or that established the value

13

of the warranty.[8]  For the foregoing reasons, we sustain Walker's second issue in part, holding that the trial court erred in including the $2,519.98 change order in the final contract price.  We overrule Walker's second issue in all other respects.

---

[8]   The only testimony regarding the value of the warranty came during Walker's cross-examination of Pichini:

Q.    There is certainly a value associated with a warranty.  Is there not?

A.    Yes, sir.

. . . .

Q.    Is it a flat fee?

A.    Yes, sir.

. . . .

Q.    What's the value of the warranty?

A.    It depends on the job.

Q.    What's the value of the warranty on this job?

A.    I don't remember.

Q.    Thousands of dollars at least.  Agreed?

A.    No, sir.

Q.    It's only hundreds of dollars?

A.    Yes, sir.

14

**CONCLUSION**

We modify the judgment to delete the $2,519.98 award for the change order that was erroneously included in the trial court's determination of the final contract price, thereby reducing the actual damage award in favor of TRS to $3,437.77, plus pre- and post-judgment interest at the rates determined by the trial court. As modified, we affirm the judgment of the trial court.

 

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Puryear and Pemberton

Modified and, as Modified, Affirmed

Filed: April 13, 2010