Henry DONALDSON, Appellant,

v.

DIGITAL GENERAL SYSTEM, Appellee.

No. 05–03–01794–CV.

Court of Appeals of Texas, Dallas.

July 22, 2005.

Rehearing Overruled Aug. 25, 2005.

---

Richard N. Countiss, Countiss Law Firm, Houston, Jody Sheets, Glast, Phillips & Murray, P.C., Dallas, for Appellant.

William David Dunn, Jeremy Martin, Gardere Wynne Sewell LLP, Dallas, for Appellee.

Before Justices MORRIS, BRIDGES, and RICHTER.

## OPINION

Opinion by Justice BRIDGES.

Henry Donaldson, former president and chief operating officer of Digital General System (DGS), sued DGS for refusing to honor his alleged right to exercise stock options after he left the company. Donaldson argues that (1) his contract with the company permitted him to exercise the option within one year, not merely three months, after his termination; (2) his failure to submit a written demand to exercise the option was excused by DGS's actions; and (3) there is no or insufficient evidence to support the take-nothing judgment against him. We affirm the trial court's judgment.

### Facts

DGS is a telecommunications company. In 1993, with Richard Harris as chairman of the board, Donaldson was hired as president and chief executive officer. In 1998, DGS accepted a significant investor, who ultimately put a new management team in place. Donaldson was asked to stay on with the company as chief operating officer during a transition period.

Donaldson negotiated an employment agreement (Employment Agreement) with Harris that provided, among other things, for 150,000 shares of "incentive stock options." It purports to permit Donaldson to exercise the option up to one year following his termination of employment with the company. Donaldson also executed a related "Incentive Stock Option Agreement" (Option Agreement), effective the same day as the Employment Agreement. The Option Agreement provides only a 30-day period after termination in which to exercise the option. Both are subject to the company's stock option plan (the Plan), which allows only 30 days after termination in which to exercise incentive stock options.

It is undisputed Donaldson's employment terminated on March 31, 2001. In July 2001, Donaldson called Kelly Aaron, the DGS employee in charge of administering stock options, about the option. She testified that she told him her records showed that he had no active stock options and that she decided to refer the matter to Omar Choucair, the chief financial officer. Choucair and Donaldson spoke in August 2001. Choucair testified he told Donaldson he had no option to exercise because it had terminated on April 30, which was 30 days after Donaldson's termination.

After a bench trial, the trial court made findings and conclusions and held that the 30-day time period in the Option Agreement prevailed over any apparently conflicting time frame in the other documents. The trial court also held that, even if Donaldson had one year to exercise the option, his failure to submit written demand was not excused by any conduct of DGS. Thus, any attempt he made to exercise the option orally was ineffective. Donaldson appealed, asserting error in the trial court's construction of the contract and asserting the evidence was legally and factually insufficient to support the judgment.

### Standard of Review

We review challenges to a trial court's conclusions of law as a matter of law. *Boyd v. Diversified Fin. Sys.*, 1 S.W.3d 888, 890 (Tex.App.-Dallas 1999, no

pet.). We view the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex.1998). We uphold the finding if it is supported by more than a scintilla of evidence. *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995). More than a scintilla of evidence exists where the evidence supporting the finding, as a whole, rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Id.* Concerning the scope of review for legal sufficiency, we credit all favorable evidence that a reasonable factfinder could believe and disregard all contrary evidence except that which a reasonable factfinder could not ignore. *See City of Keller v. Wilson*, No. 02–1012, 168 S.W.3d 802, at 807, 822–23, 2005 WL 1366509 at *1, *11 (Tex. June 10, 2005). When reviewing findings of fact for factual sufficiency, we consider and weigh all of the evidence and set aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986).

**Principles of Contract Construction**

In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983). Courts should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *Id.* No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument. *Id.* A court must give the language of a contract its plain grammatical meaning un-

less doing so would defeat the parties' intentions. *DeWitt County Elec. Co-op., Inc. v. Parks*, 1 S.W.3d 96, 101 (Tex.1999).

Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered. *Coker*, 650 S.W.2d at 393–94. If the written instrument is worded so that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous, and the court will construe the contract as a matter of law. *Id.* A contract, however, is ambiguous when its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning. *Id.*

Once a contract is found to be ambiguous, the interpretation of the contract becomes a fact issue. *Id.* at 394. Extrinsic evidence is admissible to determine the meaning of an ambiguous contract. *Robinson v. Robinson*, 961 S.W.2d 292, 298 (Tex.App.-Houston [1st Dist.] 1997, no pet.).

**The Contract Provisions at Issue**

Three documents raise the issue concerning what time period the parties intended Donaldson to have after termination to exercise the option. The Employment Agreement purports to provide a one-year post-termination period in which to exercise the incentive stock option:

> **Stock Options.** Subject to the approval of the Board, the Company shall grant [Donaldson] an incentive stock option covering 150,000 shares of the Company's Common Stock. ... The term of such option shall be 10 years, *subject to earlier expiration one year following the termination of [Donaldson's] Employment or other service with the Company.* ... [T]he grant of such option shall

be *subject to the other terms and conditions set forth in one of the [DGS] Stock Option Plans and in the company's standard form of stock option agreement* . . .

(Emphasis added.)

The Option Agreement provided for a 30–day period only:

*Termination of status as an employee.* In the event of termination of [Donaldson], he may, but only within thirty days after the date of such termination . . . exercise this Option. . . . [I]f he does not exercise this Option within the time specified herein, the Option shall terminate.

Both the Employment Agreement and Option Agreement were subject to the company stock option plan. The Plan was the one approved in 1992. It provided for a 30–day post-termination period to exercise "Incentive Stock Options" and a 6–month post-termination period for "nonstatutory options" as follows:

(b) *Termination of Status as an Employee or Consultant.* In the event of termination of an Optionee's Continuous Status as an Employee . . . , such Optionee may, but only within thirty (30) days (or such other period of time, not exceeding three (3) months in the case of an Incentive Stock Option or six (6) months in the case of a Nonstatutory Stock Option, as is determined by the Board, with such determination in the case of an Incentive Stock Option being made at the time of grant of the Option) after the date of such termination. . . .

**The Trial Court's Findings and Conclusions**

The trial court concluded the documents are ambiguous, given the seemingly conflicting time period in the Employment Agreement and Option Agreement, with both subject to the Plan, which has yet another articulation of time limits. Examining the language of the documents and other evidence, the trial court determined that

the agreements themselves provide the answer for what "trumps" what. Because the Employment Agreement expressly refers to and is made subject to the Plan and the Stock Option Agreement, but the Stock Option Agreement is not made expressly subject to the Employment Agreement, the Stock Option Agreement's contrary term controls.

In related findings, the trial court found:

Harris's testimony is equivocal and demonstrates that Harris has no recollection of actually discussing the one-year term. Further, this "recollection" would put the agreement of the parties in direct opposition to even the most generous grant of time (six months for a Nonstatutory option) in the 1992 Stock Option Plan.

Donaldson argues that the "plain language" of the Employment Agreement resolves the issue: after providing a one-year post-termination period, it states the Employment Agreement is subject to the "other" terms set forth in the Plan and the standard stock option agreement. Thus, he argues, to give meaning to the term "other," contradictory terms in the Plan and Option Agreement do not apply. Donaldson also argues that Harris, the party with whom he negotiated the Employment Agreement, provided undisputed extrinsic evidence that they intended for Donaldson to have a one-year post-termination period in which to exercise the option. He points to Harris's testimony when asked, "Did you ever have the belief that [Donaldson] had only 30 days under this agreement to

exercise his option?" Harris answered, "No." Harris also denied that he knew of any document that would change the one-year provision in the Employment Agreement.

We conclude, as the trial court did, that the contract is ambiguous concerning the intended time limit in which to exercise the option. Accordingly, determination of the parties' intent through extrinsic evidence is a question of fact. *Robinson,* 961 S.W.2d at 298.

■ In our review for legal sufficiency, we view the evidence in the light favorable to the verdict, crediting favorable evidence if a reasonable factfinder could and disregarding contrary evidence unless a reasonable factfinder could not. *See City of Keller v. Wilson,* No. 02–1012, 168 S.W.3d at 807, 822–23, 2005 WL 1366509 at *1, *11 (Tex. June 10, 2005). We disagree with Donaldson's contention that Harris provided "undisputed" evidence that the two negotiators intended the one-year provision to apply rather than the 30–day limit in the Option Agreement. Harris testified he thought he told Donaldson's lawyer the terms seemed "all standard kind of stuff to me." He also testified, "We discussed 150,000 shares of options under the *normal routine,* although we didn't specifically get into dotting I's and crossing T's in that negotiation (emphasis added)." Importantly, Harris could not recall having any discussion with Donaldson about the one-year provision or any other specific contract language. We conclude there is more than a scintilla of evidence to support the trial court's finding that the parties' intended the standard 30–day limit in the Option Agreement to apply.

■ To test for factual sufficiency, we consider and weigh all of the evidence. *Cain,* 709 S.W.2d at 176. As noted, Harris's testimony was equivocal on whether he intended a one-year provision or the 30–day limit under the "normal routine." Concerning Donaldson, the evidence shows he was well-versed in the details of the Plan. As top manager, he had recommended option grants to others under the Plan. He had personally received at least four previous options subject to the Plan and had previously exercised three of them. He acknowledged that the Board was authorized to issue "incentive stock options" only under the approved Plan, and that the Plan permitted only a 30–day post-termination exercise period for incentive stock options.

After reviewing all of the evidence, we conclude the determination that the parties intended the 30–day period to apply is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. We resolve Donaldson's first issue against him as well as his evidentiary challenge in the fourth issue concerning the option's exercisability term.

## Written Demand

■ The Option Agreement provided the option was "exercisable by written notice," and set forth details required in the notice. It further stated, the option would be "deemed to be exercised upon receipt by the Company of such written notice." The Plan as well provided that an option "shall be deemed to be exercised when written notice of such exercise has been given to the Company." It was undisputed that Donaldson never submitted a written request to exercise the option. The trial court held that, even if Donaldson could have exercised his option within one year, he was "not excused from making a demand in writing by any conduct of Defendant."

Donaldson argues that, when in July 2001 he spoke to Kelly Aaron at the company, she informed him that he had no

active options on her books. This, he argues, constituted a breach of the company's obligation to honor the option, and thus excused him from any further obligation to submit written notice. *Ware v. Miller*, 82 S.W.3d 795, 804 (Tex.App.-Amarillo 2002, pet. denied) ("As a matter of public policy, courts do not require performance of useless acts."). DGS argues the written-notice requirement is a condition precedent, which Donaldson was required to perform in order to trigger DGS's obligation, if any, to honor the option.

■■■■ "A condition precedent is an event that must happen or be performed before a right can accrue to enforce an obligation." *Centex Corp. v. Dalton*, 840 S.W.2d 952, 956 (Tex.1992). Whether a contractual provision is a condition, rather than a promise, must be gathered from the contract as a whole and from the intent of the parties. *Hohenberg Bros. Co. v. George E. Gibbons & Co.*, 537 S.W.2d 1, 3 (Tex.1976).

■■■■ Texas courts may excuse nonperformance of a condition precedent without other reason if the condition's requirement "will involve extreme forfeiture or penalty" and "its existence or occurrence forms no essential part of the exchange for the promisor's performance." *Beard Family P'ship v. Commercial Indem. Ins. Co.*, 116 S.W.3d 839, 853–54 (Tex.App.-Austin 2003, no pet.). Texas courts have focused on whether performing the condition precedent was the object of the contract or "merely incidental" to it. *Id.* In addition, if one party prevents the other from performing a condition precedent, then the condition is "considered as fulfilled." *Houston County v. Leo L. Landauer & Assocs., Inc.*, 424 S.W.2d 458, 464 (Tex.Civ.App.-Tyler 1968, writ ref'd n.r.e.) (citing *Miller v. Hodges*, 260 S.W. 168, 172 (Tex.Com.App.1924, judgm't adopted)).

Donaldson testified that when he spoke with Kelly Aaron, he advised her he wished to exercise the stock option and that Aaron said the books showed he had no options. Aaron testified that Donaldson did not request, nor did she send, the standard form to exercise an option. Rather, she testifies, she referred the matter to Omar Choucair, the chief financial officer. In August, Choucair and Donaldson spoke. Choucair testifies he told Donaldson the company considered that the option had terminated on April 30, which was 30 days after Donaldson's termination.

Donaldson's testimony indicates he understood the importance to the company of written notice in order to set the optionee's exercise date. The record also shows he was well-versed in the contents of the one-page form, having submitted it three times previously. Moreover, there is no evidence that the company *prevented* Donaldson from submitting a written notice to exercise an option. *Landauer*, 424 S.W.2d at 464.

We conclude, as did the trial court, that the written-notice requirement was not excused by any act of DGS and that Donaldson's failure to deliver a written notice was fatal to his claim that DGS breached the contract. We resolve Donaldson's third issue against him, as well as his evidentiary challenges to the written-notice requirement in his fourth issue.

Accordingly, we affirm the trial court's take-nothing judgment against Donaldson.