**Appellant's Motion for Rehearing Overruled; Memorandum Opinion of September 12, 2013 Withdrawn; Affirmed and Substitute Memorandum Opinion on Rehearing filed November 21, 2013.**



**In The**

# Fourteenth Court of Appeals

---

## NO. 14-12-00507-CV

---

**DANFORD MAINTENANCE SERVICE, INC., Appellant**

**V.**

**THE DOW CHEMICAL COMPANY, A DELAWARE CORPORATION, Appellee**

---

**On Appeal from the 412th District Court**
**Brazoria County, Texas**
**Trial Court Cause No. 48875**

---

## SUBSTITUTE MEMORANDUM OPINION ON REHEARING

We overrule Danford Maintenance Service, Inc.'s motion for rehearing, withdraw our memorandum opinion issued September 12, 2013, and issue this substitute memorandum opinion on rehearing.

In eight issues, Danford contends the trial court erred by granting summary judgment disposing of Danford's quantum-meruit and breach-of-contract claims against The DOW Chemical Company, a Delaware Corporation. We affirm.

## I. BACKGROUND

DOW is a chemical company which maintains a facility in Freeport, Texas, called "Texas Operations – TXO" ("Texas Operations"). Danford is a Texas corporation which provides mowing, landscaping, and vegetation-control services. In 1998, Dow and Danford entered into a five-year contract for Danford to provide services at Texas Operations. The parties entered into a new five-year contract in 1999. Danford alleges that under the 1998 and 1999 contracts, it performed herbicide services on at least 1600 acres at Texas Operations.

In 2002, DOW terminated Danford's contract and began using another service provider. In 2005, DOW entered into a new, three-year contract with Danford to perform services at Texas Operations ("the 2005 Contract"). The 2005 Contract provided that Danford would perform certain "in-scope" services at a fixed rate of $105,250 per month and certain "out-of-scope" services at fixed rates on an as-requested basis. The 2005 Contract also included a provision stating, "The non-aquatic herbicide application program at Dow consists of clear ground spraying of an estimated 1000 acres of rock-covered terrain." Danford alleges this provision "understated the area requiring herbicides by at least 603 acres." According to Danford, it applied herbicides to over 1600 acres but was paid for spraying 1000 acres. Danford asserts that it raised this issue several times with DOW, but DOW responded the additional acreage was included within in-scope services under the 2005 Contract.

In 2007, DOW terminated the 2005 Contract. Thereafter, Danford filed suit alleging (1) DOW breached the 2005 Contract by failing to provide the requisite

2

notice before terminating the contract and (2) DOW owed Danford payment under a quantum-meruit theory for herbicide services performed on the additional 600 acres. Danford later amended its petition to assert, as an alternative to the quantum-meruit claim, that DOW breached the 2005 Contract by failing to pay Danford for spraying the additional 600 acres because this work was included as out-of-scope services.[1]

DOW moved for summary judgment on Danford's claims. In its motion for summary judgment pertaining to quantum meruit, DOW argued quantum meruit based on Danford's spraying the additional 600 acres is barred because the 2005 Contract unambiguously pertained to all herbicide services performed at Texas Operations—not just to a specified amount of acreage. Danford responded by noting the "estimated 1000 acres" provision and presenting parol evidence that DOW and Danford negotiated for herbicide services for 1000 acres, not 1600 acres. The trial court sustained DOW's parol-evidence objections to Danford's evidence and granted DOW's quantum-meruit motion.

In its motion for summary judgment pertaining to breach of contract, DOW argued no breach occurred because (1) Danford's spraying the additional 600 acres was in-scope services, for which Danford was paid in full, (2) Danford failed to comply with a condition precedent requiring timely invoices for out-of-scope services, and (3) Danford failed to comply with a condition precedent requiring DOW's pre-approval for out-of-scope services. The trial court granted the motion without specifying its reasons.

Additionally, Danford moved for summary judgment on its breach-of-contract claim regarding DOW's alleged failure to provide sufficient notice before

---

[1] Danford asserted other claims against DOW, all of which were disposed of by summary judgment. On appeal, Danford does not raise any issue relative to these claims.

terminating the 2005 Contract. The trial court granted Danford's motion as to DOW's liability for failing to provide notice of termination.

On April 16, 2012, the trial court resolved all remaining issues in a "FINAL JUDGMENT," which referenced and "made final" the court's previous interlocutory summary judgments and awarded Danford damages regarding DOW's breach of contract for failing to provide notice of termination. Danford now appeals, challenging the trial court's summary judgment relative to Danford's quantum-meruit and breach-of-contract claims based on herbicide services pertaining to the additional 600 acres.[2]

## II. SUMMARY JUDGMENT

### A. Standard of Review and Standard of Contract Construction

We review summary judgments *de novo*. *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 156–57 (Tex. 2004). When the trial court grants summary judgment without specifying on what grounds, we will affirm if any of the independent grounds presented is meritorious. *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872–73 (Tex. 2000). We take as true all evidence favorable to the nonmovant and indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Joe*, 145 S.W.3d at 157.

A party moving for traditional summary judgment must establish there is no genuine issue of material fact and it is entitled to judgment as a matter of law. *See* Tex. R. Civ. P. 166a(c); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215–16 (Tex. 2003). If the movant establishes a right to summary judgment, the burden shifts to the nonmovant to present evidence raising a material fact issue.

---

[2] DOW initially filed a cross-appeal challenging the trial court's judgment awarding damages to Danford but later filed a motion to dismiss the cross-appeal, which we granted.

*See M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 23 (Tex. 2000) (per curiam); *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995).

The issue of whether a contract is ambiguous is a question of law that we review *de novo*. *Bowden v. Phillips Petroleum Co.*, 247 S.W.3d 690, 705 (Tex. 2008). When interpreting a contract, our primary concern is to ascertain and give effect to the written expression of the parties' intent. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011). We must examine and consider the entire writing in an effort to harmonize and give effect to all provisions so that none will be rendered meaningless. *Id.* We give terms their plain and ordinary meaning unless the contract indicates that the parties intended a different meaning. *Dynegy Midstream Servs., Ltd. P'ship. v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009). We also bear in mind the particular business activity to be served, and when possible and proper to do so, we avoid a construction that is unreasonable, inequitable, and oppressive. *Frost Nat'l Bank v. L & F. Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (per curiam).

If a contract is worded so that it can be given a certain or definite meaning, then the contract is unambiguous, and we will construe it as a matter of law. *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 806 (Tex. 2012). If the contract is subject to more than one reasonable interpretation after applying the pertinent rules of contract construction, then the contract is ambiguous and there is a fact issue regarding the parties' intent. *Id.* An ambiguity does not arise simply because the parties advance conflicting interpretations of the contract; for an ambiguity to exist, both interpretations must be reasonable. *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 728 (Tex. 2001). If a contract is unambiguous, we must enforce it as written without considering parol evidence. *See David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008) (per curiam).

## B. Quantum Meruit

We begin with Danford's second issue, in which it challenges the trial court's summary judgment pertaining to quantum meruit. The parties agree that, as a general rule, a plaintiff cannot seek equitable recovery in quantum meruit for valuable services rendered if an express contract covers those services. *See Truly v. Austin*, 744 S.W.2d 934, 936 (Tex. 1988); *Bluelinx Corp. v. Tex. Const. Sys., Inc.*, 363 S.W.3d 623, 627 (Tex. App.—Houston [14th Dist.] 2011, no pet.).[3] The rationale behind this rule is that parties should be bound by their express agreements, and recovery under an equitable theory is generally inconsistent with an express agreement which already addresses the matter. *Dardas v. Fleming, Hovenkamp & Grayson, P.C.*, 194 S.W.3d 603, 620–21 (Tex. App.—Houston [14th Dist.] 2006, pet. denied).

Hence, if the 2005 Contract covered Danford's herbicide services to the alleged 600 additional acres, Danford may not recover in quantum meruit. Danford contends the following provision of the 2005 Contract either unambiguously provided that herbicide services applied to only 1000 acres or is ambiguous on the issue and must be decided by the fact-finder: "The non-aquatic herbicide application program at Dow consists of clear ground spraying of an *estimated 1000 acres* of rock-covered terrain." (emphasis added).[4] In considering

---

[3] The *Truly* court explained some exceptions to this general rule, none of which apply in the present case. 744 S.W.2d at 936–37.

[4] Danford also relies on the trial court's "finding" in one of its orders that the 2005 Contract is ambiguous regarding the scope of herbicide services. However, because we determine as a matter of law whether a contract is ambiguous, we do not defer to the trial court's ambiguity determination. *See Bowden*, 247 S.W.3d at 705; *see also EOG Res., Inc. v. Hanson Prod. Co.*, 94 S.W.3d 697, 701 (Tex. App.—San Antonio 2002, no pet.) ("The interpretation of an unambiguous contract is a question of law and we are not required to defer to any interpretation afforded by the trial court.").

Danford's argument, we interpret this provision within the context of the entire 2005 Contract.

### 1. The 2005 Contract

The 2005 Contract began with "ARTICLE I – STATEMENT OF SERVICES" which included:

> 1.1    Description – As requested by DOW from time to time during the term of this Agreement, [Danford] shall furnish landscaping, mowing, and vegetation control services and competent labor and supervision to perform related management of such in a workmanlike manner, any or all services as described in Exhibit A,[5] attached to and made part of this Agreement, (herein called "Services").

Article IV, governing costs of services, provided, "For the performance of Services under this Contract, DOW shall pay [Danford] as shown in Exhibit B" and stated that Exhibit B would set a fixed monthly rate for services (meaning in-scope services) and rates for out-of-scope services.   Article V, governing invoicing, required Danford to submit monthly invoices on which in-scope and out-of-scope charges were listed separately.   Article VI, governing Danford's responsibilities, provided,

> No Contractor Personnel are to be furnished and no Services are to be performed under this Contract by [Danford] unless specifically provided by this Agreement or unless otherwise expressly authorized in writing by DOW. Mowing of areas not specified in the Site Specifications or contained within this Contract shall not be done unless prior written authorization is received from the Site Contract Administrator.

The 2005 Contract included Exhibits A, B, and C.   Exhibit A, entitled, "Description of Services," indicated that Danford is to provide a variety of property-maintenance services, including:

---

[5] Note that this provision states Exhibit A describes services.

- Mowing
- Landscaping
- Bed maintenance of existing beds
- ***Herbicide application***
- ***Vegetation control***
- Bed irrigation
- Monitoring of irrigation system integrity
- Pest control for plants and landscaping beds

[Danford] is to provide labor, equipment, tools, materials, and supervision to prioritize, plan, and execute above services, as may be required, in order to meet the Site Specifications detailed in Exhibit C of this Agreement.[6]

(emphasis added). Danford was required "to furnish all herbicide chemicals required for the site." Additionally, Exhibit A included the following "LOCATION OF SERVICES" provision:

Services under this Agreement are to be performed at the following:
- Dow locations – Freeport, TX (referred to as Texas Operations - TXO).

During the term of this Contract, the scope may be modified to add or to delete specific DOW and DOW Affiliate sites/locations only as may be specified in another Exhibit or Rider or per DOW's prior written approval.

In a "RESPONSIBILITIES" section, DOW agreed to provide assistance to Danford "to define work areas" and "[m]eet annually with [Danford] on a per site basis to develop the herbicide inventory and strategy for the next year." Danford's responsibilities included the following:

---

[6] Note that this provision states Exhibit C describes site specifications for the services.

8

Scheduling crews and equipment so as to *control all vegetation in all sites within scope* at all times. [Danford] must be self-directed and respond to vegetation outbreaks, as required.

Providing the Site Contract Administrator with a Bare Ground Application Program and a Schedule for the site. This shall include a list of herbicides to be used for the Calendar year and a schedule for spraying the site, with a completion of first application of herbicides by the end of the first week in April.

(emphasis added).

Section IV of Exhibit A pertains to "OUT OF SCOPE ITEMS" and provided in relevant part,

'Out of Scope Work' is defined as work that requires specific scheduling (outside of normal daily routine) of personnel and equipment for a specific time period. Any Out of Scope Work must be pre-approved by the Site Contract Administrator prior to commencement.

The following items are to be considered as out of scope of this Agreement, and, as such, DOW will incur additional charges, as stated in Exhibit B, for the items listed below. Approval from the Site Contract Administrator must be obtained by [Danford] prior to furnishing these items.

- Tree clearing
- Palm tree trimming
- New bed creation
- Installation of new shrubs
- Water hyacinth removal
- Maintenance of in-ground irrigation systems
- Wind and storm clean-up

Under Exhibit B, DOW agreed to pay Danford a fixed fee for in-scope services of $1,263,000 per year ($105,250 per month). This provision also contained the statement, "All services are considered to be within scope of the

9

Contract unless it is clearly specified as an out-of-scope item." Next in Exhibit B was an "OUT OF SCOPE SERVICES" fees chart, providing specific rates for equipment and labor for out-of-scope services including, among other items,

- Slope Mower

- Spray Rig (500 Gallon)

- Tractor and 15' Mover

- Tractor and 6' Finish Mower

- Tractor and 6' Mower

- Powered Hand Tool (e.g. . . . weed eater, back pack sprayer . . . )

Exhibit C—which, as we have noted in footnotes 5 and 6, was designated by prior provisions as the exhibit describing site specifications for Danford's services—contained several scope-related charts. An "IN-SCOPE Work" chart pertained to "[a]ll mowing, landscaping and vegetation control at the following sites per provided maps" and listed fourteen specific sites.

The next chart, "OUT OF SCOPE Work," provided,

- Fence building/mending-Barb wire fencing & gates, fence line clearing
- Water Hyacinths: Removal and Herbicide Spraying
- Environmental Issues
- Brush Clearing
- Tree Clearing
- Addition of new properties
- Maintenance of all in-ground irrigation systems
- Palm Tree Trimming: Trim every other year to every third year as required to approximately 5 to 7 branches on top of trees.

Thereafter is a chart entitled "Weed Control Guidelines," which provided,

Weeds visible to the Plant populace are unacceptable in Texas Operations. All areas covered by rock and in crevices between concrete slabs and buildings shall be kept clear of grass and weeds with herbicides. Property owners should contact the Site Contract Administrator to communicate a weed control problem in their area. Weeds will be controlled through five different functions under the same Contractor as described below[.]

The chart then listed the five functions, each with its own explanation: (1) "Large Tractor Mowing," (2) "Lawn Service," (3) "Manicure Mowing," (4) "Landscaping," and (5) "Herbicide Application." The explanation for "Herbicide Application" was as follows:

*Our herbicide application program is a clear-ground program. All areas covered by rock will be kept clear of grass and weeds with herbicides.* Areas not covered with rock should not be sprayed due to prevent erosion [sic]. Weeds in these areas will be dealt with by one of the mowing or landscaping programs above. *Weeds are not acceptable.* Contact the Site Contract Administrator with any weed problem.

(emphasis added).

The next chart in Exhibit C was entitled "In-Scope Herbicide Application Program" and forms the basis of Danford's argument:

In-Scope Herbicide Application Program

Herbicide Application Program Scope

- *The non-aquatic herbicide application program at Dow consists of clear ground spraying of an estimated 1000 acres of rock-covered terrain.* This includes all Security Fence around Plants A, B, Oyster Creek, and Salt Dome Operations.

- This includes road shoulders, above ground OSBL Pipe ways, parking area, rail road tracks, ditches, well head pads, valve settings, and process areas inside Plants A, B, OCD, Interplant and Salt Dome Operations plant sites and some of the enjoining properties.

- All clear ground areas shall be treated once yearly with an application of herbicide and then as required for maintaining a clear ground. (warranty work)

(emphasis added). The chart also included provisions detailing when Danford should apply herbicides, the type of herbicides to be applied, and that an annual October meeting would be held between the parties to discuss the impending year's "Bare Ground Application" strategy. Several additional charts followed, pertaining to mowing, landscaping, weed control, and other related services at various locations.

## 2. Analysis

Based on the above-described provisions, we conclude a reasonable interpretation of the 2005 Contract is that the parties intended for Exhibit C to specify the scope of in-scope herbicide services: as noted in footnotes 5 and 6, a trail of provisions pointed to Exhibit C as the exhibit which described site specifications for Danford's services. Danford contends the "estimated 1000 acres" provision in Exhibit C limited in-scope herbicide services to approximately 1000 acres. We reiterate that a provision cannot be read in isolation but must be considered in the context of the whole contract. *See In re Ford Motor Co.*, 211 S.W.3d 295, 298 (Tex. 2006); *see also Italian Cowboy*, 341 S.W.3d at 333 ("[W]e must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." (citation omitted)).

As expressed above, the "IN-SCOPE Work" chart in Exhibit C pertained to "[a]ll mowing, landscaping and vegetation control at the following sites per provided maps" and listed fourteen specific sites. Additionally, the "Weed Control Guidelines" chart in Exhibit C provided, "All areas covered by rock and in

crevices between concrete slabs and buildings shall be kept clear of grass and weeds with herbicides," and "Our herbicide application program is a clear-ground program. . . . Weeds are not acceptable." In light of these clear, strongly-worded provisions, it would be unreasonable to construe the "estimated 1000 acres" provision as limiting the scope of herbicide application relative to the fourteen sites listed in the "IN-SCOPE Work" chart. The only reasonable construction of the "estimated 1000 acres" provision is as an estimate of the amount of rock-covered terrain rather than a contractual limitation.[7] Our holding should not be interpreted to mean that use of imprecise modifiers such as "estimated" or "approximately" automatically indicates a contractual provision is not intended to have limiting effect.[8] However, construing the 2005 Contract as a whole, we conclude the "estimated 1000 acres" provision cannot reasonably be interpreted as limiting the scope of in-scope herbicide application to 1000 acres.

---

[7] DOW also provided a non-binding, imprecise example in the "SAFETY" article of the 2005 Contract, which stated, "In general, pipelines right-of-ways are non-hazardous and meter stations are hazardous areas. DOW representatives will define safe work permit requirements during the course of work." Clearly, because of the modifier "in general," the parties were not agreeing that *all* pipelines right-of-ways were non-hazardous and *all* meter stations were hazardous. Instead, DOW was explaining a general circumstance for Danford's benefit but not something for which DOW was contractually bound. The parties' use of the modifier "estimated" to describe "1000 acres" is analogous.

[8] Construing instruments with materially different language from the 2005 Agreement, several courts have held such modifiers had a reasonable limiting effect. *See, e.g.*, *Caviness Packing Co., Inc. v. Corbett*, 587 S.W.2d 543, 546 & n.3 (Tex. Civ. App.—Amarillo 1979, writ ref'd n.r.e.) ("[U]se of the term 'approximately' in specifying the weights gives some latitude in that [cattle] could weigh slightly more or less than 300 to 325 pounds, but a difference of 100 pounds in a steer of the size in question exceeds the permissible ambient of the approximation."); *Syring-Workman, Inc. v. Colbert*, 532 S.W.2d 708, 710 (Tex. Civ. App.—San Antonio 1976, writ ref'd n.r.e.) ("Clearly 'approximately' contemplates the possibility of a reasonable variance between the stated figure and the final cost."); *Lindsey v. Gamble*, 359 S.W.2d 520, 522 (Tex. Civ. App.—Amarillo 1962, writ ref'd n.r.e.) (concluding clause in couple's will—"In the event that our deaths should occur simultaneously, or approximately so"—not triggered because their respective deaths occurred 72 days apart, which "cannot be said to have occurred at approximately the same time within the meaning of the will").

However, neither party presented evidence regarding whether the 600 acres about which Danford complains were included within any of the fourteen sites. If the 600 acres were located outside the fourteen sites, it is clear from Exhibit C that herbicide application to this acreage was not within the ambit of in-scope herbicide application. Nonetheless, even if Danford's herbicide application to the 600 acres was not in-scope, Danford's quantum-meruit claim would fail if these services were included under the out-of-scope provisions.

As noted above, Exhibits A and C provided that out-of-scope services included services such as fence maintenance, water hyacinth control, environmental issues, tree and brush clearing, and "[a]ddition of new properties." These out-of-scope provisions did not explicitly mention mowing or herbicide application. However, "[a]ddition of new properties" is broad enough to cover situations in which DOW instructs Danford to provide mowing, landscaping, or weed-control services to areas outside the fourteen sites specified in the "IN-SCOPE Work" chart in Exhibit C. The out-of-scope rates chart in Exhibit B included rates for "Spray Rig (500 gallon)," back pack sprayer, lawn mowers, and weed eater, and hourly wage rates for workers. Hence, the parties clearly anticipated there might be situations in which DOW would request Danford to provide mowing or weed-control services beyond the range of in-scope services. The parties agreed to rates for these out-of-scope services, thus avoiding the need for further negotiations should such services become necessary. Accordingly, the parties intended that any *non-in-scope* herbicide services would be covered by the 2005 Contract as out-of-scope services.

We recognize that the out-of-scope rates chart does not include rates for herbicide chemicals. However, this does not establish that the parties intended for herbicide application to be excluded from out-of-scope services. In the in-scope

services provision of Exhibit A, the parties agreed, "[Danford] is to furnish all herbicide chemicals required for the site." Moreover, in the out-of-scope services provision of Exhibit A, the parties agreed, "Unit rates [listed in Exhibit B] are to include labor, equipment, travel time, and anything else that may be required to perform the stated activity or task." These provisions indicate that Danford would supply chemicals at its own expense whenever performing herbicide application under the 2005 Contract—even if out-of-scope.

In sum, we conclude the parties unambiguously intended for all mowing, weed-eating, and vegetation-control services (including herbicide services) to be covered by the 2005 Contract as either in-scope services or out-of-scope services. The parties did not intend for there to be situations in which Danford performed extra-contractual mowing, weed-eating, and vegetation-control services at Texas Operations. Therefore, Danford's provision of herbicide services to the additional 600 acres was covered by an express contract and does not support equitable recovery in quantum meruit. *See Truly*, 744 S.W.2d at 936. The trial court properly granted summary judgment against Danford on its quantum-meruit claim. We overrule Danford's second issue.[9]

In its third issue, Danford argues the trial court erred by sustaining DOW's objections to Danford's parol evidence demonstrating that the parties did not intend for herbicide services to the additional 600 acres to be covered by the 2005 Contract. However, because these services were unambiguously covered under the 2005 Contract, Danford's parol evidence to the contrary varies the terms of the 2005 Contract and thus may not be considered. *Houston Exploration Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011) ("The

---

[9] We also overrule that portion of Danford's first issue in which Danford broadly contends the trial court erred by "entering final judgment on its prior interlocutory order[]" pertaining to quantum meruit.

[parol-evidence] rule does not prohibit consideration of surrounding circumstances that inform, rather than vary from or contradict, the contract text."); *see also Anglo-Dutch Petroleum Int'l, Inc. v. Greenberg Penden, P.C.*, 352 S.W.3d 445, 452 (Tex. 2011) ("Given our conclusion that the agreement was not ambiguous, this evidence [of surrounding circumstances] is of limited relevance. It cannot be used to show the parties' motives or intentions apart from the Fee Agreement; it can only provide the context in which the agreement was reached."); *Frontier Logistics, L.P. v. Nat'l Prop. Holdings, L.P.*, --- S.W.3d ---, No. 14-11-00357-CV, 2013 WL 1683603, at *6 (Tex. App.—Houston [14th Dist.] Apr. 18, 2013, no pet. h.) ("The Plank Parties also rely upon parol evidence regarding the negotiating and drafting of the Settlement Agreement. But, to the extent that this parol evidence contradicts the plain meaning of the Settlement Agreement, this evidence is incompetent to change the agreement's unambiguous language."). We overrule Danford's third issue.

## C. Breach of Contract

In its fourth issue, Danford generally contends the trial court erred by granting summary judgment in favor of DOW on Danford's claim that DOW breached the 2005 Contract by refusing to pay for Danford's out-of-scope herbicide application to the additional 600 acres. Because the summary-judgment evidence does not reflect whether Danford's herbicide application to the additional 600 acres came within the fourteen in-scope sites (and thus were unambiguously in-scope services) or did not come within these sites (and thus were unambiguously out-of-scope services), we must address Danford's issues regarding its breach-of-contract claim.

In its motion for summary judgment, DOW argued that, even if Danford's herbicide services to the 600 additional acres were considered to be contractual

16

out-of-scope services, Danford is barred from recovering payment for these services because it failed to comply with the condition precedent specified in Article V of the 2005 Contract:

> In the event that [Danford] determines that services were provided to DOW under this agreement but were not invoiced, DOW agrees to discuss and address the payment for these services provided [Danford] has brought them to DOW's attention within six months of the services being provided. DOW will not pay for any uninvoiced services that were performed if [Danford] does not invoice DOW within this six-month timeframe.

### 1. Prior Material Breach Argument Waived

In its sixth issue, Danford contends it was excused from complying with Article V because DOW committed a prior breach by terminating the 2005 Contract without proper notice. However, Danford waived this affirmative defense by failing to raise it in response to DOW's motion. *See McLernon v. Dynegy, Inc.*, 347 S.W.3d 315, 323–24 (Tex. App.—Houston [14th Dist.] 2011, no pet.) ("If the defendant wishes to assert an affirmative defense to defeat summary judgment on the plaintiff's claim, he must urge the defense in his response and present sufficient evidence to create a fact issue on each element."); *City of The Colony v. N. Tex. Mun. Water Dist.*, 272 S.W.3d 699, 746 (Tex. App.—Fort Worth 2008, pet. dism'd) (explaining prior material breach is an affirmative defense). We overrule Danford's sixth issue.

### 2. No Waiver of Condition Precedent

In its seventh issue, Danford asserts three reasons why DOW waived its right to insist on compliance with Article V. DOW argues Danford was not allowed to raise waiver because Danford did not plead waiver in its live petition. However, DOW did not object on the basis of lack of pleadings when Danford asserted waiver in its response to DOW's motion for summary judgment. Thus,

17

Danford's waiver argument was "tried by consent." *See Via Net v. TIG Ins. Co.*, 211 S.W.3d 310, 313 (Tex. 2006) (holding parties tried by consent unpleaded discovery rule in summary-judgment proceeding because movant did not object when nonmovant raised discovery rule in its response).

Waiver is the intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right. *Sun Exploration & Prod. Co. v. Benton*, 728 S.W.2d 35, 37 (Tex. 1987). Waiver of a condition precedent may be inferred from a party's conduct. *Id.* The failure to satisfy a condition precedent may be waived by the failure to insist on performance. *See Ames v. Great S. Bank*, 672 S.W.2d 447, 449 (Tex. 1984); *Kennedy v. McMullen*, 39 S.W.2d 168, 174 (Tex. Civ. App.—Beaumont 1931, writ ref'd). Additionally, when the obligation of a party to a contract depends upon a certain condition being performed, and the fulfillment of the condition is prevented by the act of the other party, the condition is considered fulfilled. *Dorsett v. Cross*, 106 S.W.3d 213, 217 (Tex. App.—Houston [1st Dist.] 2003, pet. denied). Although waiver is generally a question of fact, it may become a question of law where the facts and circumstances are admitted or clearly established. *Straus v. Kirby Court Corp.*, 909 S.W.2d 105, 108 (Tex. App.—Houston [14th Dist.] 1995, writ denied).

First, Danford argues DOW waived its right to demand compliance with Article V by persistently maintaining in its pleadings, motions, and interrogatory responses that Danford's herbicide services to the 600 additional acres were in-scope services and failing to insist Danford submit the required invoices. Danford notes that DOW did not allege Danford's failure to comply with Article V until its sixth amended answer, over three years into the litigation. Danford also points out that it sent an interrogatory request asking DOW,

If you contend [Danford] did not comply with all terms of the

18

Contract, please identify the Contract provision, the manner in which you contend [Danford] did not comply with the Contract provision, the date and the time of the alleged non-compliance.

DOW responded that Danford did not comply with provisions regarding Danford's workers and badging requirements—DOW did not refer to Article V or any notice or invoicing requirements. Danford additionally presented summary-judgment evidence that DOW insisted Danford's herbicide services to the 600 additional acres were not out-of-scope services.

We disagree that the foregoing factors raise a fact issue on whether DOW failed to insist on compliance with Article V. DOW's position that the complained-of services were in-scope does not support directly or inferentially that DOW was waiving its right to insist on compliance with the invoicing condition precedent for the services if they were out-of-scope. We also note that Danford did not allege a breach-of-contract claim based on the herbicide application to the additional 600 acres being out-of-scope services until it filed a fifth amended petition in August 2010—almost two years after it filed its original petition. Until that time, Danford's only claim regarding these services was its quantum-meruit claim, which DOW contended failed because the services were in-scope. Furthermore, DOW responded to the interrogatory in September 2009, almost a year before Danford alleged a breach-of-contract claim for which Article V was relevant.

Second and similarly, Danford contends DOW, by continually asserting that herbicide services to the 600 acres were in-scope services, acted in a manner inconsistent with a belief that DOW needed to submit invoices for the additional services. We reject this argument because DOW's asserted belief that the services were in-scope does not infer DOW was waiving the invoicing condition precedent required if the services were out-of-scope: these are mutually exclusive concepts.

19

Danford's argument might gain more traction if DOW had asserted the herbicide services to the 600 acres were *out-of-scope* services and, through its words or conduct, led Danford to believe compliance with the invoicing requirements was unnecessary. However, DOW's insistence that the complained-of services were in-scope services is simply not conduct inconsistent with the invoicing requirement.

Third, Danford contends that DOW's "belligerent insistence that the In-Scope provision of the contract covered the additional acreage effectively prevented Danford from seeking payment under the contract." In support of this argument, Danford presented deposition testimony of Danford's president, who testified he would discuss maps with DOW at monthly meetings and at some point was told DOW did not want to discuss expanding the maps to cover additional areas Danford claimed it was servicing. Danford's president also testified his friend, the DOW employee who mapped the sites, stated that DOW told the employee, "[D]on't talk about it [the amount of acreage] anymore if you want to stay out here." Furthermore, in an affidavit, Danford's president averred,

> 2. During our 2005 contract with Dow I brought up the extra acreage that we were treating with herbicides at Dow's request to Dow at our monthly progress meetings within a month or two if [sic] us encountering the extra acreage on our spraying efforts. These meetings were initially held with Bruce Broadway and later with Gary Waldrep. I continued to bring this issue up to Dow at nearly every monthly progress meeting through October 2007 and at other times during the contract.
>
> 3. I also brought this to Oscar Greak's attention several times in 2006 and continued my requests in 2007. Oscar was in charge of the Managed Services Group that handled our contract until Kathy Krupp took over late in 2007. Oscar attended several of the monthly progress meetings.
>
> 4. Dow refused to acknowledge that we were treating more than

20

1,000 acres with herbicides and insisted that the extra work we were performing was not out of scope services. They certainly would not have paid any invoices submitted for these services.

Danford contends DOW waived the invoicing requirement of Article V by insisting that the subject herbicide services were not out-of-scope services, thus preventing Danford from submitting invoices for out-of-scope services. In support of its position, Danford cites *Donaldson v. Digital General System*, 168 S.W.3d 909 (Tex. App.—Dallas 2005, pet. denied).

In *Donaldson*, plaintiff's contract with his former employer contained a provision requiring plaintiff to provide written notice in order to exercise his stock options. *Id.* at 912, 915. Several months after his employment terminated, plaintiff inquired about his stock options with employer's stock administrator. *Id.* The administrator informed plaintiff that employer's records indicated he had no active stock options. *Id.* The administrator referred the matter to employer's CEO, who advised plaintiff his options had terminated. *Id.* at 916. Plaintiff never filed written notice to exercise stock options, but argued employer waived the notice requirement by informing him he had no options. *Id.* The Dallas Court of Appeals disagreed, holding nothing employer's personnel told plaintiff excused his burden to file written notice or prevented him from doing so. *Id.*

Similarly, DOW's insistence that the 600 acres were within in-scope services in no way *prevented* Danford from submitting invoices for the services.[10] Accordingly, we overrule Danford's seventh issue, having rejected all three subparts of the issue.

---

[10] Danford further argues that requiring it to submit invoices would have been futile and harmful to Danford's relationship with DOW. However, Danford waived this argument by failing to cite any supporting authority. *See* Tex. R. App. P. 38.1(i); *I–10 Colony, Inc. v. Chao Kuan Lee*, 393 S.W.3d 467, 479 (Tex. App.—Houston [14th Dist.] 2012, pet. denied).

### 3. Inapplicability of Texas Rule of Civil Procedure 93(12)

Finally, in its eighth issue, Danford argues DOW is precluded from relying on Article V because DOW failed to file a verified denial pursuant to Texas Rule of Civil Procedure 93(12), alleging that Danford did not comply with the notice requirements of Article V.[11]

> Under Rule 93(12),
>
> A pleading setting up any of the following matters, unless the truth of such matters appear of record, shall be verified by affidavit.
>
> . . .
>
> That notice and proof of loss or claim for damages has not been given as alleged. Unless such plea is filed such notice and proof shall be presumed and no evidence to the contrary shall be admitted. A denial of such notice or such proof shall be made specifically and with particularity.

Tex. R. Civ. P. 93(12). Thus, if a defendant denies a plaintiff's allegation that the plaintiff gave notice and proof of loss or claim for damages, the defendant must file a verified denial. *See Anchor Cas. Co. v. Bowers*, 393 S.W.2d 168, 170 (Tex. 1965) ("[W]here a proof of loss is concerned, and there is a denial of such proof of loss, such denial 'shall be made specifically and with particularity'" (quoting former version of Rule 93(12)).

However, DOW did not urge that Danford failed to provide a compliant proof of loss—DOW argued Danford failed to comply with Article V's invoicing requirement. The invoicing requirement of Article V is not a condition for "notice

---

[11] We liberally construe Danford's appellate brief as containing the following argument: because Danford generally averred all conditions precedent had been performed or had occurred and DOW failed to specifically deny that Danford had complied with Article V, under Texas Rule of Civil Procedure 54, Danford was not required to prove that it complied with Article V. However, Danford waived this argument by failing to raise it in the trial court. *See Priddy v. Rawson*, 282 S.W.3d 588, 597 (Tex. App.—Houston [14th Dist.] 2009, pet. denied).

and proof of loss or claim for damages." Instead, it is a requirement that Danford bill DOW within a certain time frame for sums Danford claims are due. We hold Rule 93(12) is inapplicable in this situation. We overrule Danford's eighth and final issue.[12]

### III. CONCLUSION

We affirm the trial court's judgment.


/s/      John Donovan
         Justice


Panel consists of Chief Justice Frost and Justices McCally and Donovan.

---

[12] We also overrule that portion of Danford's first issue in which Danford broadly contends the trial court erred by "entering final judgment on its prior interlocutory order[]" pertaining to breach of contract.